IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2003 Session

## STATE OF TENNESSEE v. DIALLO JAMEL LAUDERDALE

**Appeal from the Circuit Court for Henry County**
**No. 13058    Julian P. Guinn, Judge**

_____

**No. W2001-01296-CCA-R3-CD  - Filed September 5, 2003**

_____

The defendant, Diallo Jamel Lauderdale, was convicted by a Henry County Circuit Court jury of first degree felony murder, and the trial court sentenced him as a violent offender to life in the Department of Correction. The defendant appeals, claiming that (1) the evidence is insufficient to support his conviction; (2) the wording of the felony murder by aggravated child abuse and neglect statute resulted in an indictment that failed to inform him of the charged offense, is vague, and resulted in him being convicted by less than a unanimous verdict; (3) the trial court erred by denying his motion to suppress; and (4) these cumulative errors and a juror's failing to mention until after the jury had been sworn that she was a friend of the victim's family denied him the right to a fair trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

B. Kirk Vandivort and Jerred A. Creasy, Charlotte, Tennessee, for the appellant, Diallo Jamel Lauderdale.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, for the appellee, State of Tennessee.

### OPINION

This case relates to the death of seven-year-old Dominique Porter. Officer Joshua Mann Frey of the Paris Police Department testified that he responded to an Emergency Medical Services (EMS) call at 1003 Reynolds Street on May 29, 2000, at 6:04 p.m. He said that when he arrived at the scene, the victim was in an ambulance and appeared to have burn marks on the left side of her face and neck. He said that the victim was unresponsive and that he interviewed Archilene Lauderdale, the defendant's mother, who informed him that she and her husband had just arrived at the

defendant's apartment, found the victim unresponsive, and telephoned EMS. He said that three or four other children and Mrs. Lauderdale's husband were also at the scene but that the defendant was not present. He said he went into the living room but did not notice anything out of the ordinary.

Officer Frey testified that he went to the emergency room at the Henry County Hospital and interviewed the defendant. He said the defendant was at the hospital visiting Alecia Porter, who was the defendant's girlfriend and the victim's mother. She was there giving birth to their child. He said that the defendant was calm and that the defendant told him the victim had gone to bed about 2:00 p.m and was still sleeping when he left the apartment at 5:00 p.m. Officer Frey said he also talked with a doctor, who told him that the victim's burns appeared to be two to three days old and that a CAT scan showed the victim's brain had shifted from left to right. On cross-examination, Officer Frey testified that he did not get into the ambulance with the victim but looked at her through the back door. He said he interviewed Keshonte Porter, the victim's younger sister. He said that he also interviewed Alecia Porter and that he tried to interview the defendant's neighbors but was unable to contact any of them.

Alecia Lynette Porter, the victim's mother, testified that she had six children. She said that three were the defendant's and that at the time of the victim's death, she and the defendant had been together for about four and one-half years. She said that on May 28, 2000, she was in the Henry County Hospital having a baby. She said that she last saw the victim on May 25, that the victim was fine at that time, and that she learned about the victim's injuries on May 29. She said that when she saw the victim at the Henry County Hospital, the victim was bandaged up and she could only see the victim's eyes. She said the victim remained unresponsive and died at Vanderbilt Hospital after life support was removed. She said the defendant told her the victim had fallen off the bed. She said that her apartment's living room had a concrete floor covered with tile and that an oriental rug partially covered the floor.

On cross-examination, Ms. Porter testified that the victim and Keshonte Porter sometimes ironed their own clothes and often played at the playground down the street. She said that when the victim was transported to Vanderbilt Hospital, Dr. Carolyn Orr told her that the victim had scratches on her neck. She denied telling Dr. Orr that the victim got the scratches while playing at the park several days before the crime in question. On redirect examination, Ms. Porter testified that to the best of her knowledge, the defendant was the only person supervising her children while she was in the hospital.

Dr. Mary Barraza Taylor, a pediatric intensive care physician at Vanderbilt Children's Hospital, testified that she was the victim's treating physician when the victim arrived at Vanderbilt on May 29 and that Dr. Frederick Barr became the victim's primary caregiver the next day. She said the victim was in a coma and unresponsive. She said that the victim stiffened her arms and legs in response to stimulation and that the victim's pupils were fixed and dilated at different sizes and did not respond to light. She said the victim had no spontaneous movement and had abnormal brain function. She said a dark line with small crescent-shaped marks and dark scratch-type marks were around the victim's neck. She said the victim had first and second degree burns that extended from

her breastbone to her stomach and additional burns on her face, neck, and left leg. She said dark bruises were in the middle of the victim's back.

Dr. Taylor testified that there were no obvious cuts or bruises on the victim's scalp but that a CAT scan showed a lack of blood to the left side of the victim's brain. She said that the left side of the brain was severely swollen and that a small amount of blood had collected outside the brain. She said the victim basically had no chance of recovering from her neurological injuries. She said that based on the victim's injuries, she suspected child abuse and contacted social services and Dr. Suzanne Starling, a child abuse specialist.

On cross-examination, Dr. Taylor testified that the victim's burns were caused by scalding liquid and that her initial report classified the victim's burns as superficial. She said that some of the marks on the victim's neck were scabbed over and that she could not tell how long the scabs had been present. She said that tests did not show obvious signs of a tear in a blood vessel that would have inhibited the supply of blood to the victim's brain. She said the victim had no retinal hemorrhaging, which is associated with shaking and choking. She said that the victim had been intubated at the hospital, which means that a tube had been placed in the victim's throat, and that she had never seen an intubation cause bruising of the neck. She said that Dr. Barr discovered a fracture at the base of the victim's skull but that she did not see the fracture.

Dr. Frederick Earl Barr, an assistant professor in pediatrics and a pediatric intensive care physician at Vanderbilt University Medical Center, testified that he became the victim's treating physician on May 30, 2000. He said that the victim suffered a severe brain injury, that the left side of her brain was swollen, and that she died on June 2, 2000. He said swelling in the victim's brain created pressure, which cut off blood flow to the brain and led to brain death.

On cross-examination, Dr. Barr testified that he was not a neurologist and that he relied on the radiologist to read CAT scans. He said that there was not enough blood inside the victim's skull to cut off the flow of blood to the brain and that it was unusual to see that type of brain injury from a fractured skull without a large amount of blood around the brain. On redirect examination, Dr. Barr testified that the victim's brain injury could have been caused by strangulation.

Dr. Suzanne Key Starling testified that she was a pediatrician and the director of the Child Abuse and Neglect Program at Vanderbilt Children's Hospital at the time of the victim's death. She said she was notified about the victim on May 30, 2000, and examined the victim that day. She said the victim was unconscious with no movement at all. She said the victim had several visible injuries, including second degree burns on her face, chest, and left foot. She said the burns were oblong and splotchy, indicating they were hot liquid burns. She said that the victim's left arm was swollen, that a round bruise was on the victim's forearm, and that x-rays showed the victim's arm was broken. She said that the victim had areas of round bruising in the small of her back and that children did not bruise in that area accidentally. She said bruising in the small of the back occurred when a child was hit in the back or suffered a traumatic back injury. She said that the victim had multiple areas of crescent moon-shaped scabs and cuts on the neck and that she had seen similar

injuries from fingernails. She said the victim had a red line across the front of her neck, which could have been a ligature mark.

Dr. Starling testified that the CAT and MRI scans revealed an area of bleeding and swelling in the left side of the victim's brain. She said the victim had suffered a significant brain injury that did not correspond with any natural disease. She said the victim had a skull fracture, which could have been caused by blunt force to the head. She said the fact that only the left side of the victim's brain was swollen meant the victim could have been strangled. She said that she spoke with the victim's mother and the defendant and that the defendant told her the victim fell out of a top bunk bed and was burned by steam from a clothes iron. She said that although she did not ask the defendant about the marks on the victim's neck, the defendant told her the victim had been choked by a playmate three days before the crime in question. She said that the defendant's explanations did not account for the victim's injuries, that she diagnosed the victim as having been abused, and that she contacted the Paris Police Department.

On cross-examination, Dr. Starling testified she was not a neurologist but a consultant who evaluated children suspected of being abused. She said that she was not qualified to render a cause of death opinion and that her allegation of strangulation was based on the injury to the left side of the victim's brain, the fingernail marks on the victim's neck, and the line across the victim's neck. She said that although the line across the victim's neck was consistent with choking, it could have been caused by something else. She said that a simple fall was insufficient to explain the victim's brain injury but that very complex, high speed, and large impact falls could cause an internal injury to the brain. She said that the victim's intubation could have caused bruising around the neck.

Investigator Jacque Dartanion Bass of the Paris Police Department testified that he began investigating the victim's injuries after receiving Dr. Starling's report. He said that he visited the defendant's apartment and that the living room had a hard floor covered with tile and one or two throw rugs. He said a set of bunk beds was in the victim's bedroom. He said that the police did not test the bathtub, the clothes iron, or the victim's clothing for blood, hair, or skin; that no tests were performed in the victim's bedroom; and that the water temperature in the apartment was not tested.

On cross-examination, Investigator Bass testified that the defendant voluntarily accompanied him to the police station, never asked to leave, and never requested an attorney. He said that he read the defendant his rights, that the defendant waived those rights, and that the defendant voluntarily gave a statement. He said that he interviewed the defendant for approximately one and one-half hours and that part of the interview was videotaped. He said that the defendant told police he had been whipping the victim in the bathroom because she had not done her chores and that the victim fell and may have hit her head against the bathtub. He said that at first, the defendant claimed to know nothing about the victim's burns but that the defendant later admitted splashing water on the victim. He said that according to the defendant, the defendant thought the victim was asleep when the defendant left the apartment. He acknowledged that based on the defendant's statements, the incident could have been an accident. On redirect, Investigator Bass testified that the defendant gave another statement in which he said the victim had fallen off a bunk bed and landed on a clothes iron.

-4-

On recross-examination, he testified that Keshonte Porter had told police that the victim fell out of bed and landed on an iron.

Keshonte Porter, who was the victim's younger sister and nine years old at the time of trial, testified that on May 29, 2000, the victim forgot to make her bed and went to the park. She said that the defendant told her to get the victim and that when she and the victim returned to the apartment, the defendant took the victim into the bathroom and whipped her. She said that the defendant was holding the victim's arm when they came into the living room and that the defendant picked the victim up over his head and slammed the victim onto the floor. She said that the victim was lying unresponsive on the floor and that the defendant poured water from the kitchen faucet onto the victim. She said that she and the defendant put fresh clothes on the victim because the victim's clothes were wet and that the defendant put the victim into the top bunk bed. She said the defendant told her to tell people that the victim fell off the bed and hit her face on a clothes iron.

On cross-examination, Keshonte testified that she did not check on the victim and that when the defendant's parents arrived at the apartment, she did not tell them the victim was hurt. She said that she heard the defendant whipping the victim in the bathroom and that the bathroom door was closed. She said that she did not see the victim fall off the bed on May 29 but that she saw burns on the victim. She said she saw the burns after the defendant poured water on the victim but before the defendant put the victim into the bunk bed. She said that she got the water from the kitchen faucet, that the water was hot, and that she gave the water to the defendant. She said she did not remember telling a police officer that she had changed the victim's clothes by herself.

Special Agent Brian Byrd of the Tennessee Bureau of Investigation (TBI) testified that he was assigned to investigate the case. He acknowledged that Keshonte Porter had told Officer Joshua Frey that the victim fell out of bed. He also acknowledged that when he interviewed Keshonte on June 13, she told him that her statement to Officer Frey had been untrue. He said that during his June 13 interview with Keshonte, Keshonte told him that she went to get the victim at the playground and that the victim was fine at that time. He said Keshonte stated that when the victim and the defendant came out of the bathroom, she could tell the defendant had spanked the victim. He said Keshonte told him that the defendant lifted the victim over his head and dropped her on the floor. He said that according to Keshonte, the defendant got water and threw it on the victim and that she changed the victim's clothes.

Agent Byrd testified that Keshonte had no explanation for lying to Officer Frey but that she admitted not telling Officer Frey the truth. He said that according to Keshonte, no adult told her to make up the story about the victim falling out of bed. He said that after he talked with Keshonte on June 13, she testified at the defendant's preliminary hearing that the victim fell off the bed and onto an iron. On cross-examination, Agent Byrd testified that when he talked to Keshonte on June 13, the defendant was not present but that when Keshonte testified at the preliminary hearing, the defendant was in the courtroom.

Officer Joshua Frey was recalled by the defense and testified that he talked to Keshonte Porter at the Henry County Medical Center. He said that Keshonte told him the victim had fallen out of the bunk bed and that an iron fell on the victim. He said that only Alecia Porter was present when he talked with Keshonte.

Sergeant Thomas E. Lankford of the Paris Police Department testified that he was present during the end of the defendant's videotaped interview. He acknowledged that the defendant voluntarily went to the police station, was free to leave at any time, and voluntarily gave a statement. He said that he did not test the clothes iron or the temperature of the tap water in the defendant's apartment. On cross-examination, Sergeant Lankford testified that the defendant weighed about two hundred thirty pounds and that the defendant told physicians at Vanderbilt Children's Hospital that the victim had fallen out of bed and landed on an iron. He said that the defendant repeated that story during the videotaped interview but that the defendant later admitted lying about what had happened to the victim. He said the defendant later explained that the victim fell, hit her head on the bathtub, and that the defendant poured cool and hot water on the victim.

Lawrence Lloyd Niemi, the Maintenance Manager for the Paris Housing Authority, testified that on May 26, 2000, he responded to a complaint in the defendant's and Alecia Porter's apartment about a high electric bill. He said that he discovered the water heater in the apartment was set at 140 degrees Fahrenheit and that he turned down the thermostat to 130 degrees.

Archilene Turner Lauderdale, the defendant's mother and a registered nurse, testified that she and her husband went to Paris, Tennessee on May 29, 2000, to see the defendant's new baby. She said that when they arrived at the defendant's apartment, the defendant was not there and the children were alone in the living room. She said that she telephoned the hospital and spoke to Alecia Porter and that Ms. Porter told her the defendant was not at the hospital. She said that according to Ms. Porter, Ms. Porter had just spoken with the defendant and the defendant was supposed to be at the apartment. She said that Keshonte was sitting on the living room couch and did not seem worried. She said that she asked Keshonte where the victim was and that Keshonte told her the victim was asleep.

Mrs. Lauderdale testified that the apartment was clean and that the floor had been mopped. She said that she and her husband decided to take the children out to eat and that when she went to wake the victim, she heard the victim snoring. She said that she tried to wake the victim but that the victim did not respond. She said that she shook the victim and put a damp washcloth on her but that the victim remained unresponsive. She said she telephoned the victim's mother and 9-1-1. She said that she asked Alecia Porter about scratches on the victim's neck and that Ms. Porter told her the victim had been fighting with Keshonte and other children.

Mrs. Lauderdale testified that she did not notice anything unusual or abnormal about the victim other than burns on her face. She said that the victim had a normal temperature and pulse but that the victim's snoring was abnormal. She said the EMS attendant put a "zap monitor" on the victim's finger, which showed that the victim was breathing. She said that Keshonte told her the

victim had fallen out of bed, was talking, got back into bed, and went to sleep. She said Keshonte also told her that the victim burned her face on an iron.

On cross-examination, Mrs. Lauderdale testified that she expected the defendant to be at the apartment when she arrived and that the children would not be alone. She said that she could not say if Ms. Porter was concerned about the defendant's absence but that Ms. Porter had thought the defendant was at home with the children. She said that the victim did not sound like she was in respiratory distress and that the victim's skin color was good.

Gary William Lauderdale, the defendant's father, testified that he went with his wife to Paris. He said that the defendant's apartment was clean and that it looked as though someone had mopped the floor because wet spots were in the bathroom, hallway, and kitchen. He said that no one was home with the children and that he asked his wife to find out where the defendant was while he assembled a crib for the defendant's baby. He said that they went into the victim's bedroom and that the victim was facing the wall and appeared to be sleeping. He said that the victim's bunk bed was on the right side of the room and that a clothes iron was on the floor on the left side of the room. He said he did not notice any water in the bedroom.

Carolyn C. Orr, a social worker at Vanderbilt Children's Hospital, testified that she and Dr. Starling interviewed Alecia Porter on May 30, 2000. She said Ms. Porter told them that two or three days before the crime in question, the victim had been playing with other children at the park and returned home with scratches on her neck. She said that according to Ms. Porter, the victim had been involved in an altercation with other little girls over a pair of shoes. On cross-examination, she said the shoe incident "sounded like it was a group of children out playing and squabbling."

The defendant testified that on May 29, 2000, he was living between his mother's house and Alecia Porter's apartment. He said he was staying with Ms. Porter the week of the incident in question because Ms. Porter was going to have a baby. He said that although only three of Ms. Porter's children were his, all of them called him "daddy." He said the children played at the park every day and did chores, including washing dishes, mopping floors, and ironing clothes. He said that the victim and Keshonte ironed clothes on Keshonte's bottom bunk in their bedroom.

The defendant testified that Ms. Porter had her baby on May 28 and that he and the other children were at Ms. Porter's apartment on May 29. He said that he and the children cleaned the house in preparation for the new baby and that he told the children they could go to the park if they cleaned their rooms. He said that the victim went to the park without cleaning her room and that he sent Keshonte to get her. He said that he was not mad at the victim but that he was worried about her because she had left the apartment without telling him where she was going.

The defendant testified that after Keshonte and the victim returned, he went into the bathroom and found the victim wiping out the sink. He said that her clothes were wet and that he asked her, "Why did you leave?" He said he grabbed the victim's arm and hit her twice with a belt. He said the victim pulled away from him, fell, and hit her head on the bathtub. He said that

Keshonte got some water from the kitchen sink and that he threw the water on the victim because she was unresponsive. He said that he did not know the temperature of the water but that it was warm. He said he got more water from the bathroom sink and threw it on the victim. He said that when the victim did not respond, he tried to give her CPR. He said he thought the victim was conscious because she spit out some of the water.

The defendant testified that he put the victim in the top bunk bed and that she grabbed him. He said that the victim did not have burns on her face at that time and that he did not know she was seriously injured. He said that when the victim fell in the bathroom, he did not see any bumps, bruises, or blood on her. He said that before he left the apartment to go visit Ms. Porter, he checked on the victim. He said that she was snoring and that he thought she just wanted to be left alone. He said he did not slam the victim to the floor and that he had disciplined the children before. He said the bedrail in the top bunk was broken and had fallen onto the floor earlier that day. He said that he did not intentionally hurt or kill the victim and that he loved her.

On cross-examination, the defendant testified that he did not tell Keshonte to make up the story about the victim falling out of bed and that he did not know why Keshonte was claiming that he picked up the victim and threw the victim to the floor. He said that Keshonte was not a liar but that she did not always tell the truth. He said he was not lying to Officer Frey when he said that he did not know what happened to the victim because he was unaware of the victim's injuries at that time. He said he was not lying to Dr. Starling when he told her the victim fell out of bed and was burned by the iron because that is what Keshonte had told him. He said that he did not know how the victim broke her arm and that he did not shake or choke her.

Charles Warren Harlan, the county medical examiner, testified that he reviewed the autopsy report prepared by Dr. O.C. Smith and completely agreed with the data in the report. He said the victim had burns on her face and neck and a burn that extended onto her chest. He said the burns were liquid burns consistent with steam or water that was the same temperature as steam. He said that water turned to steam at 210 degrees Fahrenheit and that he was certain the victim's burns were caused by water at that temperature, not 130-degree tap water. He said that 130-degree tap water could have caused the victim's burns only if she had had prolonged contact with the water.

Dr. Harlan testified that the scabs on the victim's neck were consistent with scabs five to eight days old. He said he found no bruising around the victim's neck and no evidence of strangulation. He said that the victim's skull fracture and brain injury were consistent with a slip and fall and that the victim's skull fracture was more consistent with her falling against a curved or edged surface than a flat surface. He said that with the victim's type of injuries, she could have appeared normal for hours or days. He said the victim's broken arm also was consistent with a fall. He said that the victim's death was an accident and that he did not believe she had been abused. On cross-examination, Dr. Harlan testified that he trained Dr. Smith and that Dr. Smith was one of his best students. He said that strangulation did not cause brain swelling directly but that it could lead to brain swelling.

Dr. O'Bryan Clary "O.C." Smith, a forensic pathologist, testified on rebuttal that he performed the victim's autopsy. He said the victim died from blunt trauma to the head and compressive forces to the neck. He said that Dr. Harlan was not present during the autopsy and that a slip and fall did not explain the victim's injuries. He said that during the victim's autopsy, he found bleeding on both sides of the victim's neck, indicating compression to the neck. He said that water 120 degrees Fahrenheit could burn skin but that it could take thirty seconds before water that temperature caused blistering. He said that 130-degree water could cause burns very quickly.

Dr. Smith testified that the victim's head injuries were consistent with a two-hundred-thirty-pound man holding the victim over his head and throwing her to the floor. He said that in cases of strangulation, a victim's fingernails could scratch the victim's neck as the victim tried to remove a hand or ligature from around the neck. He said the scabs on the victim's neck looked as though they had been healing during the victim's four-day stay in the hospital.

On cross-examination, Dr. Smith testified that hemorrhages in the front of the victim's neck and bleeding from her right carotid artery were recent injuries and evidence of strangulation. He said that the victim's larynx was not damaged but that ligature strangulation usually did not damage the larynx. He said that intubation did not cause the victim's neck injuries. He said that the back of the victim's skull was fractured and that the injury could have resulted from the victim's head hitting a flat or edged surface. He said that a slip and fall generally would not create enough force to explain the victim's head injury. The jury convicted the defendant of first degree felony murder.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his first degree felony murder conviction because Keshonte Porter's testimony that the defendant picked up the victim, lifted her over his head, and dropped her to the floor conflicts with the medical testimony, which established that the victim died of a fracture to the back of her skull. The defendant claims that if he had dropped the victim as Keshonte claimed, the victim would have landed on the floor face-down and would not have suffered a skull fracture to the back of her head. In addition, the defendant claims the evidence is insufficient because Dr. Charles Harlan testified that the victim's skull fracture was consistent with the victim's head hitting an edged surface, not a flat surface such as a floor. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse, aggravated child neglect." Tenn. Code. Ann. § 39-13-202(a)(2). Child abuse and neglect occurs when "any person . . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(a). Aggravated child abuse occurs when the "act of abuse results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1).

Viewed in the light most favorable to the state, the evidence is sufficient to support the conviction. Alecia Porter testified that she last saw the victim on May 25 and that the victim was fine at that time. On May 29, the victim went to the park without doing her chores and the defendant, who was the victim's sole caretaker, sent Keshonte Porter to get the victim. Keshonte testified that when she and the victim returned to the apartment, the defendant whipped the victim in the bathroom, brought the victim into the living room, lifted the victim over his head, and slammed the victim onto the floor. The defendant then splashed hot water on the victim in an attempt to revive her, put her into bed, and left the apartment. Although the defendant at first told the police that the victim had been injured by falling out of bed, he later claimed that the victim had slipped in the bathroom and hit her head against the bathtub.

Dr. Mary Taylor testified that the victim was comatose when she arrived at Vanderbilt Children's hospital and had burns on the front of her body, bruises in the middle of her back, and scratch marks around her neck. She also testified that Dr. Frederick Barr discovered a fracture at the base of the victim's skull. Dr. Suzanne Starling testified that the victim's left arm was broken and that her skull fracture could have been caused by blunt force to the head. Dr. Starling concluded that marks on the victim's neck and the fact that only the left side of the victim's brain was swollen indicated that the victim could have been strangled, and Dr. Barr also stated that the victim's brain injury could have been caused by strangulation. Dr. Charles Harlan testified for the defense that he found no evidence of strangulation, that the victim's skull fracture was consistent with the victim's head hitting an edged surface, and that the victim had not been abused. However, Dr. O.C. Smith, who performed the victim's autopsy, testified that the victim died of blunt trauma to the head and compressive force to the neck and that the skull fracture could have been caused by the back of the victim's head hitting a flat or edged surface. Drs. Starling and Smith both testified that the defendant's claim that the victim fell against the bathtub did not account for the victim's extensive injuries. The jury heard the inconsistencies and alternate theories raised by the state and the defendant and decided to accredit the state's theory of the crime. Based upon the medical testimony and Keshonte's Porter's eyewitness account of the defendant dropping the victim, the evidence is more than sufficient to support the defendant's conviction for first degree felony murder.

## II. FELONY MURDER BY AGGRAVATED CHILD ABUSE AND NEGLECT STATUTE

The defendant makes several arguments relating to the felony murder by aggravated child abuse and neglect statute. First, he claims that the wording of the statute resulted in an indictment

that did not sufficiently inform him of the charged offense. Specifically, he contends that the indictment failed to inform him of the charge because it alleged that he committed first degree murder by aggravated child abuse or aggravated child neglect, and he did not know which underlying felony to defend. Second, he claims that the statute's separating aggravated child abuse and aggravated child neglect into two separate underlying felonies causes the felony murder statute to be unconstitutionally vague. As a final and related issue, he argues that the statute resulted in his being convicted without a unanimous verdict because some jurors may have found him guilty of felony murder by aggravated child abuse while other jurors may have found him guilty of felony murder by aggravated child neglect. The state claims that the indictment provides the defendant with sufficient notice, that the felony murder by aggravated child abuse statute is not unconstitutionally vague, and that the jury's verdict was unanimous. We agree with the state.

## A. Sufficiency of the Indictment

The indictment charges the defendant as follows:

> The Grand Jurors of the State of Tennessee, duly elected, impaneled, sworn and charged to inquire in and for the body of the County of HENRY, in the State aforesaid, upon their oath present:
>
> That DIALLO JAMEL LAUDERDALE, heretofore, to-wit: On or about the 29th DAY OF MAY, 2000, in the County aforesaid, then and there did intentionally kill DOMINIQUE PORTER in the perpetration of or attempted perpetration of aggravated child abuse or aggravated child neglect, thereby committing the offense of FIRST DEGREE MURDER, in violation of T.C.A. 39-13-202(a)(2), against the peace and dignity of the State of Tennessee.

Tenn. Code Ann. § 40-13-202 provides that an indictment "must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . ." Our supreme court has concluded that an indictment will be deemed valid so long as it provides sufficient information to enable the defendant to know the accusation to defend, to furnish the trial court an adequate basis for entry of a proper judgment, and to protect the defendant from double jeopardy. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). It also has stated that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). To this end, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000).

The defendant claims that the indictment charged two separate offenses, first degree felony murder by aggravated child abuse and first degree felony murder by aggravated child neglect, and

that he did not know which underlying felony to defend. However, aggravated child abuse and aggravated child neglect are not separate offenses in our code. See Tenn. Code Ann. § 39-15-402. Instead, aggravated child abuse and neglect is one crime that can be satisfied by two different courses of conduct, serious bodily injury caused by physical abuse or serious bodily injury caused by neglect. See Tenn. Code Ann § 39-15-402(a); State v. Hodges, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998) (providing that Tenn. Code Ann. § 39-15-401, the child abuse and neglect statute, creates only one crime). Thus, because aggravated child abuse and aggravated child neglect are not separate felonies, the indictment in this case alleged only one crime, first degree felony murder with the underlying felony being aggravated child abuse and neglect prescribed in Tenn. Code Ann. § 39-15-402(a). We note that "[when] the offense may be committed by different forms, by different means or with different intents, such forms, means or intents may be alleged in the same count in the alternative." Tenn. Code Ann. § 40-13-206(a).

The defendant's brief also claims that the indictment is insufficient because it uses the term "intentionally kill" for premeditated murder but then uses statutory language for felony murder. However, we believe that the indictment in this case sufficiently apprises the defendant of the charged offense. First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse, aggravated child neglect." Tenn. Code Ann. § 39-13-202(a)(2). The allegations in the indictment closely track the wording in the felony murder statute, and the indictment cites to the specific section of the code for that offense. The indictment is sufficient, and the defendant is not entitled to relief.

## B. Vagueness

Next, the defendant claims that the first degree felony murder statute as applied in this case is unconstitutionally vague because the statute's separating aggravated child abuse and aggravated child neglect into two separate underlying felonies "[leads] to a guess as to which theory or which conduct is alleged to have been committed." However, in State v. Rhoden, 739 S.W.2d 6, 10 (Tenn. Crim. App. 1987), this court held that the failure to raise a constitutional challenge to a statute in a pretrial motion results in a waiver of the issue on appeal. Tenn. R. Crim. P. 12(b)(2). See also State v. Farmer, 675 S.W.2d 212, 214 (Tenn. Crim. App. 1984). Our review of the record reflects that the defendant did not attack the constitutionality of the statute until his motion for a new trial. Therefore, this issue is waived. Rhoden, 739 S.W.2d at 10. In any event, as noted, the statute does not separate aggravated child abuse and neglect into two separate underlying felonies.

## C. Verdict Unanimity

The defendant claims that the wording of the first degree felony murder by aggravated child abuse statute denied him the constitutional right to a unanimous verdict. He argues that some jurors may have convicted him based upon Keshonte Porter's testimony that he slammed the victim onto the floor whereas other jurors may have convicted him based upon his failure to seek medical treatment for her. We conclude that the defendant is not entitled to relief.

The supreme court has held that in cases involving a single offense but alternate theories for the defendant's committing that offense, a jury unanimity problem is not implicated. See State v. Keen, 31 S.W.3d 196, 208 (Tenn. 2000) (stating that "research reveals no case . . . in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime"); State v. Lemacks, 996 S.W.2d 166, 170-71 (Tenn. 1999) (holding in a driving while under the influence case that a general verdict of guilty did not present a unanimity problem even though some evidence indicated that the defendant was driving the car while other evidence indicated that he was criminally responsible for another person driving the car); State v. Cribbs, 967 S.W.2d 773, 787 (Tenn. 1998) (jury's finding the defendant guilty of first degree murder raised no verdict unanimity problem even though some jurors may have believed the defendant committed felony murder while others believed he committed premeditated murder).

In this case, the defendant was guilty of first degree felony murder if the jury was satisfied that he killed the victim during the perpetration of or attempt to perpetrate aggravated child abuse or neglect prescribed by Tenn. Code Ann. §§ 39-15-401(a), -402. Thus, he was not denied his constitutional right to a unanimous verdict.

### III. MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress his statement to the police. He claims that the statement was inadmissible because he requested an attorney and because it is "simply not logical to believe that the Appellant never requested an attorney." The state claims that the trial court correctly denied the motion. We agree with the state.

At the suppression hearing, Investigator Jacque Dartanion Bass testified that on May 30, 2002, the police wanted to speak to the defendant. He said he found the defendant at the Department of Children's Services (DCS) and told him that the police wanted to speak with him. He said that he offered to drive the defendant to the police station but that the defendant said someone else was going to give him a ride. He said that the defendant later told him that he did not have a ride to the station and that he again offered to drive the defendant. He said that the defendant used a pay telephone outside of the DCS and that he did not hear the defendant's conversation. He said that he drove the defendant to the station in his unmarked police car, that the defendant was not under arrest, and that he did not handcuff the defendant. He said that when they arrived, the defendant sat in the station lobby for about ten minutes and never indicated that he wanted to leave. He said he took the defendant into an office, read the defendant his rights, and asked the defendant if he understood them. He stated that the defendant said yes, that he read a waiver of rights form to the defendant, and that the defendant signed the form. He said that he began questioning the defendant and that the defendant never asked to leave or requested an attorney. He said that after the defendant gave an oral statement, the defendant gave a videotaped statement. He said that after the defendant gave the videotaped statement, the defendant asked to make a telephone call. He said the defendant used the telephone, but he did not think anyone answered the defendant's call. He said no one threatened or coerced the defendant.

On cross-examination, Investigator Bass denied that the defendant was a suspect when he first approached the defendant at the DCS on May 30. He denied suggesting to the defendant that the defendant ride with him to the police station. He said that during the drive to the police station, he had a conversation with the defendant but that they did not discuss the case. He denied that during the ride to the station the defendant said, "Maybe I need to talk to an attorney; I want to talk to an attorney before I go down to the police station?" He also denied that the defendant said at the station that he wanted to leave or that a police officer was posted by the station door to prevent the defendant from leaving. He said the defendant did not ask to make a telephone call before the interview, and he denied that the defendant asked to speak to an attorney after Investigator Bass read the waiver of rights form to him. He said that he read the form to the defendant at 3:35 p.m. and that after the videotaped interview, he thought the defendant telephoned his mother. He said he did not remember hearing the defendant's telephone conversation.

The defendant testified that his children had been taken away from him and that he and Alecia Porter were at the DCS on May 30 trying to get the children back. He said Investigator Bass arrived and asked him to come to the police station. He said that Investigator Bass wanted to drive him to the station and that he asked Detective Bass if he could make a telephone call. He said that Investigator Bass said yes, that he telephoned his brother, and that Detective Bass was only five to ten feet away during the call. He said he asked his brother to contact his mother in order for his mother to get in touch with his attorney. He said that while he was in the patrol car, he asked Investigator Bass if he was under arrest and that Investigator Bass said no and that he was free to leave. He said he told Investigator Bass he needed to telephone his mother in order for his mother to get him an attorney. He said that when they arrived at the station, he sat in the lobby for twenty to thirty minutes and decided to leave. He said that he told Investigator Bass, "I think it would be better if I came back when I had an attorney" and that Investigator Bass replied, "No, I would prefer you stay." He said he felt like he had to stay at the station. He said that he was taken to an interview room and that Investigator Bass handed him a piece of paper and told him to sign it. He said that Investigator Bass did not read the paper to him and that he signed it. He said that after his videotaped statement, he asked to make a telephone call. He said that Investigator Bass dialed the number for him and that he talked to his aunt at 4:30 p.m. He said he asked his aunt to get him an attorney.

On cross-examination, the defendant testified that Investigator Bass never handcuffed him. He acknowledged that during the drive to the station, Investigator Bass told him that he could walk away when they arrived at the station. He acknowledged that he can read and that his signature was on the waiver of rights form.

Marilyn Sweat, the defendant aunt, testified that on May 30, she was at work from 8:00 a.m. to 4:30 p.m. She said that the defendant telephoned her as she was getting ready to leave work and that he said, "Will you call my mom and get me an attorney?" She said that the defendant told her he was at the police station and that the police would not let him leave.

Juwan Cortez Lauderdale, the defendant's brother, testified that on May 30, he got a collect telephone call from the defendant. He said that the defendant told him the police were taking the defendant to the police station for questioning. He said that the defendant did not know if he was under arrest and that he asked the defendant if the defendant wanted him to call their mother in order for her to get the defendant an attorney. He stated that the defendant said yes.

Sergeant Tom Lankford of the Paris Police Department testified that he was present during the defendant's first interview and part of the defendant's videotaped interview. He said that the defendant's videotaped statement ended about 4:30 or 5:00 p.m. On cross-examination, he said that before Investigator Bass questioned the defendant, Investigator Bass read the defendant a waiver of rights form. He said that the defendant indicated he understood the form and signed it. He said that he never heard the defendant ask for an attorney and never heard anyone tell the defendant he could not leave the station. He said that after the defendant's videotaped statement, the police arrested the defendant for aggravated child abuse and the defendant was allowed to make a telephone call. He said that it would not surprise him to learn that the videotaped statement ended at 4:58 p.m. On redirect examination, he said that the defendant's first interview lasted about twenty to thirty minutes and that the videotaped interview lasted about eight to twelve minutes.

The trial court stated that the defendant was an articulate man with above average intelligence. It determined that once Investigator Bass took the defendant to the police station, the defendant "was in some form of custody." It held, though, that the police advised the defendant of his rights and that the defendant knowingly, intelligently, and voluntarily gave the statements. The trial court denied the defendant's motion.

The defendant claims that the trial court erred by denying his motion. He claims that he "obviously requested counsel and the officer continued to [question] and tape his statement despite his request for counsel." He claims that Investigator Bass and Sergeant Lankford lied when they testified that the defendant never requested an attorney. In support of this claim, he points out that the officers testified he made a telephone call after his videotaped statement, which ended at 4:58 p.m., but that his aunt testified he telephoned her at 4:30 p.m. Thus, he contends that the officers could not be telling the truth when they said the defendant waited until after the videotaped statement to telephone his aunt and that the evidence shows he called her before the videotaped statement. Moreover, he contends that it "is not logical that the Appellant calls his aunt and tells her he needs an attorney and does not tell the officers." The state claims that the trial court's ruling shows that it accredited the officers' testimony that the defendant did not request an attorney. We agree with the state.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Further, questions of the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted

-15-

to the trial judge as the trier of fact." Id. at 628. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

Our review of the record supports the trial court's determination that the defendant knowingly, voluntarily, and intelligently waived his rights and gave his statements. Investigator Bass testified that he read the defendant his rights before the interviews, that the defendant read and signed a waiver of rights form, and that the defendant never requested an attorney. Investigator Bass further testified that nobody coerced or threatened the defendant. Similarly, Sergeant Lankford testified that he was present when Investigator Bass read the defendant his rights and said that the defendant indicated he understood his rights, signed a waiver of rights form, and never requested an attorney. The defendant claims that he asked for an attorney but that the officers continued to question him. However, the trial court's ruling demonstrates that it accredited the officers' testimony over that of the defendant and concluded that the defendant did not request an attorney. We conclude that the evidence does not preponderate against the trial court's finding and that the trial court properly denied the motion to suppress.

## IV. FAIR TRIAL

The defendant claims that these cumulative errors denied him the right to a fair trial. In addition, he contends that he was denied the right to a fair trial because a juror failed to reveal that she was a friend of the victim's family until after the jury had been sworn. The state claims that the defendant received a fair trial. We agree with the state.

First, having found no errors, there is no merit to the defendant's claim that cumulative errors denied him the right to a fair trial. Regarding his claim that a juror's withholding information during jury voir dire denied him the right to a fair trial, we note that the defendant has failed to cite to authorities as required by Rule 10(b), Tenn. Ct. Crim. App. R, and has waived the issue. See also

T.R.A.P. 27(a)(7). In any event, our review of the record reveals that after the jury had been sworn, Juror Number Eight told the trial court that she had gone to school with a friend of the victim. The trial court asked if this would affect her judgment in the case, and she indicated that it would not. The defense did not object to her remaining on the jury, and we conclude that the defendant was not denied the right to a fair trial.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE